ELBRIDGE W. SMITH  [HI #2079]
745 Fort Street, Suite 311
Honolulu, Hawaii  96813
Telephone No.:  (808) 523-5050
Fax No.:  (808) 538-1382
Email: shlaw@hawaii.rr.com

Claims Administrator

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAI`I

| | |
|---|---|
| GREGORY TAPAOAN; MICHAEL MARS; PEDRO RIBERIO; JOHN L. LEVAN; FLOYD SANTOS; FLOYD SYLVESTER; LEO TOILOLO; JOSE BACDAD; and GEORGE RABAGO, <br><br> Plaintiffs, <br> vs. <br><br> BENJAMIN CAYETANO, et al., <br><br> Defendants. | CIVIL NO. 01-00815 DAE LEK <br> (Class Action; Injunctions) <br><br> CLAIMS ADMINISTRATOR'S REPORT, PLAN OF ALLOCATION AND REQUESTED ORDER;  EXHIBITS "A"; and "B" (under Seal); <br> CERTIFICATE OF SERVICE <br><br> Magistrate Judge Leslie E. Kobayashi |

H:\CLIENTS\ACLU Prisoners' Class Action\Plead\12-29-06 Administrator Report.wpd

## CLAIMS ADMINISTRATOR'S REPORT, PLAN OF ALLOCATION AND REQUESTED ORDER

COMES NOW, Claims Administrator Elbridge W. Smith, [herein "Claims Administrator"], and hereby submits this CLAIMS ADMINISTRATOR'S REPORT, PLAN OF ALLOCATION AND REQUESTED  in accordance with the Class Action Settlement Agreement dated October 28, 2004 and related Escrow and Claims Administration Agreement dated November 8, 2004 and the subsequent Orders of this Court.

I.   BACKGROUND

This case addressed serious federal constitutional violations arising from the illegal and unconstitutional detention and mistreatment of individuals whom Defendants had no legal authority to detain.  The October 28, 2004 Class Action Settlement Agreement resolves hundreds of claims arising from the habitual failure of the Department of Public Safety to timely release individuals who had been ordered released by the courts and from the practice of subjecting such persons to invasive strip and/or cavity searches.

The Settlement Agreement provides, in part, that Elbridge W. Smith, Esq. will serve as the Escrow Agent/Claims Administrator, with approval of the Court, to administer the disbursement of the $1,200,000 Class Fund in accordance with the terms of the Settlement Agreement.  In particular, under the Settlement Agreement, the Administrator is required to distribute the Class Fund to Settlement Class Members who were over detained and/or subject to strip, visual body cavity search after acquittal or dismissal of charges during the Class Period December 10, 1999 through December 2, 2002.[1]  The distribution from the Class Fund to each qualified Settlement Class Members was not to "exceed $1000 per day of over detention or $3000 for having been subjected to one or more strip or visual body cavity searches after acquittal of charges." (*Id*. Section 4, pg. 15).

Thereafter, Davis Levin Livingston Grande and the American Civil Liberties Union Foundation of Hawaii (ACLU) ("Plaintiffs' Counsel") requested attorney Elbridge W. Smith as Escrow Agent/Claims Administrator and they entered into the Escrow and Claims Administration Agreement (hereinafter "Administration Agreement"), which was approved by this Court by Order Granting Plaintiff's Motion for Preliminary Approval of Settlement and Plaintiffs' Motion for

---

[1] Additionally the Claims Administrator was to pay the awarded attorney fees and costs to plaintiffs' counsel in the amount of $400,000.00 which was done.

Appointment of Claims Administrator and Approval of Escrow and Claims Agreement entered February 8, 2005.

II.  THE ADMINISTRATOR'S DUTIES AND EMPLOYED TASKS TO SO ACCOMPLISH

Pursuant to the governing documents cited above, the Claims Administrator commenced to provide services in February 2005, to aid in the identification of potential Settlement Class Members and the adjudication of their claims for distribution of the Class Fund.  The shear bulk of the data packages and information provided by the plaintiffs and defendants consisting of 46 boxes containing thousands and thousands of pages, various but not coordinated likely claimant lists in printed and electronic format, the need to contact and locate the expected 1000+ potential claimants from outdated records and information, necessitated not only the assistance from your Claims Administrator's then current office staff paralegals and assistants, but also the hiring of two additional part-time paralegal and clerical personnel,[2] the use of several displaced Tulane law students, the complete use of one individual office and two computers to manage the process.

The determination of the Settlement Class Members and their entitlement to disbursement from the Class Fund has basically involved a voluminous and labor intensive review and evaluation process relating to and consisting of the following primary activities:

1.  Identification of potential Class Members by review of all State Prison records from the

---

[2] Some of the tasks that the paralegal and clerical staff engaged in to assist this Claims Administrator included:  preparation of mailing labels and envelopes, copying, processing the returned mail due to out dated addresses, updating data base with new addresses, additional re-mailings, drafting data reports, drafting and mailing notices to social service agencies, claimant and family correspondence review, responding to requests for information, preparation of status reports, organization and maintenance of potential claimant binders, identifying merits of each claim by locating relevant data within each packet, data packet retrieval, transfer of logged information, physical and electronic research of court records, preparation of claims summaries, draft claimant inquiry questionnaires, draft claims status summaries.

      period December 10, 1999 through December 2, 2002. These records were contained in 38 banker boxes received from the ACLU and in 8 more boxes of parole records delivered directly from the State which had apparently not been given to ACLU.

2. Initial mailing to all individual persons identified and within the electronic and paper records obtained from ACLU and from the State defendants, to provide claim forms, Notices of Settlement and to obtain updated address. The lists, which were in different electronic and/or paper-only format, contained duplicates and triplicates, misspellings, and incorrect addresses. Because what would have been an enormous amount of review time to locate and delete duplicates, a mailing was sent to all which had addresses. Of those approximately 2000 mailings, over 700 were returned as bad addresses, including "moved - no forwarding address" or "forwarding address expired," or "no such street/number," etc. Many of the addresses stemming from incarcerations more than five years ago were now stale and inaccurate.

3. Several of the first claims received could not be located in the ACLU potential class members list (of 659 names) which had now been placed into your Administrator's database list. It was then first determined that the ACLU boxes had either never been inventoried or such inventory had been lost and could not located, necessitating a box by box inventory by two part-time new hire clerks/paralegals. That effort, taking several weeks identified a total of 9,848 individual release records, within which 451 likely new potential claimants, not on the ACLU list, were identified. There was no contact information for 113 of those.

4. Creation of a new master Access database from those partial, inaccurate and incomplete, electronic records obtained from ACLU and the State defendants, and from your Claims Administrator's physical review of those 46 banker boxes, containing 9,848 packets of release information. This new database, of 1110 believed-to-be potential likely claimants,

-4-

        allowed keeping track of mailings, address corrections, SSNs, Dates of Birth, State Identification Numbers (SIDs), whether a claim had yet been filed, been adjudicated, where the information was within those thousands of pages (by Bates number), and whether additional information was sought from the Claimant and/or the State (since many of the State records were incomplete or missing).

5. Detailed efforts to obtain corrected and current addresses by having the State research its current incarcerated persons database, by accessing City & County drivers license records, by having Tulane Law School students (here following *Katrina*) telephone family and emergency contacts from prison records, by telephone directory searches, and by professional search of WestLaw and other databases, by San Francisco firm Rosenthal & Company LLC.

6. Given the terrible state of the address and contact records available and the initially low response of filed claims, permission was obtained from the parties and the Court, and time for filing claims was extended to allow for the placement of commercial radio spots, newspaper notice/advertising, and newspaper and television articles and reports, and the remailing of notices and claim forms as addresses were updated. Copies of notices and claim forms were also distributed to prisons' officials, to various social agencies such as IHS, Community Health Centers, and Habilitat, with requests that they be posted so that possible class members not reached by commercial advertising might get notice. All persons and groups contacted, except the State Public Defenders Office, were cooperative and agreed to help.

7. Claims were preliminarily reviewed as they came in to determine whether records were available for each claimant and if not, additional requests were made to the State and to the claimants for specific records; in some cases the records were so deficient that the Claims

       Administrator began to research records at the Courthouses and via the State's electronic website databases. In some cases dozens of court records and minutes of court hearings had to be reviewed to determine claims made by a single claimant. For example, the Drill Down Detail ["DDD"] printouts are a chronological list of all admission and release dates and times; sometimes they matched specific admission and release documents, sometimes not; sometimes they had handwritten changes, which themselves did not match other internal DPS and court records and where not otherwise explained. In 36 claimant cases, the DDD reflected 59 separate releases for which no other documentation was provided but which was needed to verify or controvert Claimant statements.

8. Questions and information were received from claimants and their family members by mail and by email, and answered in kind. In some case telephone and email requests came from other attorneys who had or were now representing potential claimants in other matters and in some cases attorneys whose names appeared in court minutes were contacted to locate or confirm certain information. Often delays in releases could be traced to delays in DPS facilities timely receiving the Courts' orders.

9. Pre-settlement, it appears from the records that the judges, the prosecution and the defense attorneys all allowed dismissed or acquitted persons to be returned to the facilities for actual release and universally strip searched those persons as part of their transport back to the various facilities. But even those who were credited with time served or otherwise to be released on probation, were delayed release pending documents getting to the facility. Often those delays are attributed to defense counsel, usually the Public Defender's Office, which filed Certificates of Service indicating that such release orders/judgments were being provided (seemingly by hand delivery) to the facilities on a specific day, which were not stamped as received until 2-3 days later, suggesting regular mail or courier which did not

        deliver Friday dated orders until Mondays or Tuesdays. Your Claims Administrator did not compensate for delays in release which were clearly attributable to only defense attorney delays in order preparation and/or orders delivery to the facilities as falling within the over-detention definition of this lawsuit.

10. While presumably most of those communication problem should have been mended following the institution of this case and then following the Settlement Agreement, we received 44 claims from persons which are outside the class claims period ("OCCP"), most of those subsequent to December 2002. Ten of those OCCP claimants also had valid claims during the class claims period. All of those possible new claimants were referred to three entities: the ACLU, the Hawaii Bar Association referral list program, and to attorney Jack Schweigert who agreed to and did file civil claims on behalf of several such OCCP possible claimants, when neither the ACLU or HSBA referral responded favorably to your Claims Administrator; some were initially also referred to the Davis Levin Livingston Grande firm.

11. In several cases detainees were ordered released to agencies such as Salvation Army rehabilitation, Habilitat, and similar rehabilitation/supervision entities. Without explanation in the State's records given to us which generally did not include such contacts information, we queried both the claimant and the social agency to determine the reason for what was sometimes many days between the judge's order and the actual release.

12. Adjudications were finally made using available information from all of these sources to arrive at a determination of: a) wrongful detention and/or b) illegal searches.

        As can be observed from the above descriptions, the identification of qualifying Class Members has been complicated by: 1) the difficulty in reaching released prisoners; 2) lost records of the State Prison Defendants; 3) inconsistent and inaccurate State Prison records, 4) inconsistent

Claim information by potential Class Members in relation to State Prisons records, and 5) incomplete and inconsistent computer databases. The Claims Administrator incurred significant out-of-pocket costs for printing, publication, mailings, accounting services, estimated taxes and other related services, which will be documented in the subsequently filed Fees and Costs request.

### III.     ADJUDICATION REPORTS AND PLAN OF ALLOCATION.

Your Claims Administrator has now completed the review and adjudication of the 361 Claims which were received, 360 of them timely and 1 late filing. [3] The results of those adjudications and thus the proposed Plan of Allocation to claimants are set forth in the attached EXHIBITS "A" and "B".

EXHIBIT "A" is a redacted version, deleting the names of the claimants, and is attached to this public Final Report and Plan of Allocation filed with this Court.

An unredacted copy of the Adjudication Report, containing Claimants' full names, is designated Exhibit "B" to the Settlement Fund Claims Administrator's Final Report and Plan of Allocation is filed under seal with the Court.

The Claims Administrator also maintains, within his database, the other identifying information relating to each Claimant, approved and denied, consisting of the last known mailing address, the social security number, the SID, and the date of birth of each claimant.

---

[3] In addition to the one late filed Claim received, several other potential claimants have now contacted your Claims Administrator, requesting Claim Forms on the basis that they did not know about this process (some have been in detention most of the entire claims period time and/or been in detention since the time of the Settlement and neither received information about the process directly from the Claims Administrator, because the State did not provide any records for those persons during the Claims Period, because they claim to have been aware of the process, not having usual access to TV, radio or newspapers, and/or because your Claims Administrator did not have a current, valid address and did not send them claim forms or a copy of the published Notice which was sent to all claimants.

In summary, 180 claimants are here recommended to be awarded compensation for over detention and/or illegal strip search as those were defined in this case and in the Settlement Agreement and published notices. Your Claims Administrator is pleased to have identified and located many more potential and approved more claimants than had initially been identified by the parties in their reports and recommendations. Over 100 of the approved claims involved claimants not previously so identified during the ACLU discovery review process. In speaking with a class administration organization which has serviced similar class action claims in other major U.S. cities, it was represented that to locate and receive claims from 15% of the potential class was considered a usual return. Here, we identified over 1100 potential claimants, being about 68% more than had been identified by plaintiffs in their compiled list, and received Claim Forms from 361 of them, representing approximately 32% of the potential class.

Your Claims Administrator thus presents Exhibits "A" and "B" as his proposed Plan of Allocation and Requests that this Court so approve and allow, by Order, those specific payments to be made to each of the 180 approved claimants before December 31, 2006. [4]

Your Claims Administrator will, at the conclusion of all further activity, including verification that all awarded checks have been negotiated, all expenses have been accounted for and paid as approved, and any further necessitated actions are complete, submit his Final Claims Administrator Report, including a final accounting, and which will reflect the payments already

---

[4] In doing so, your administrator notes that he has yet to submit his attorney fees and costs requests and to review and make a recommendation to the court with respect to yet to be filed but expected late Claims. In addition, you Administrator notes that he has not yet received certain requested supplemental information regarding at least one claimant from the State of Hawaii and similar information regarding at least one other claimant represented at the time by a Deputy Public Defender, whom the claimant indicates may have both independent recollection and documentation to reflect upon part of his claim, but who has been on leave and/or otherwise unavailable during this past month.

made for Plaintiffs' counsel attorney fees and costs and your Administrator's costs and expenses. In the meantime, your Claims Administrator will submit an interim request for compensation and costs reimbursement.

DATED: Honolulu, Hawaii, December 29, 2006.

*/s/ Elbridge W. Smith*

_____
ELBRIDGE W. SMITH
Claims Administrator